ERNESTO SOLARI ET AL. *v.* UNITED STATES

No. 4943.—Invoices dated Naples, Italy, April 29, 1936, etc.
　　　　Certified April 29, 1936, etc.
　　　　Entered at New York, May 25, 1936, etc.
　　　　Entry Nos. 34048, etc.

(Decided June 21, 1940)

*Strauss & Hedges; Lane & Wallace; Brooks & Brooks; Barnes, Richardson & Colburn*, Associate counsel (*Albert McC. Barnes, Eugene F. Blauvelt, Hadley S. King, Samuel Isenschmid*, and *Frederick W. Brooks, Jr.*, of counsel) for the plaintiffs.
*Webster J. Oliver*, Assistant Attorney General (*William J. Vitale*, special attorney), for the defendant.

CLINE, Judge: These five appeals for reappraisement were consolidated for trial. The merchandise under reappraisement in the various appeals and the entered values thereof are as follows:

No. 120021–A. Pecorino Romano Sardo cheese exported by Cav. Giovanni Ambriola & Fratello of Naples, Italy, on April 29, 1936, entered at $63 per 100 kilos, less cash discount of 2 per centum and less inland freight, cartage, and ocean freight.

No. 120030–A: Reggiano cheese exported by Figli Di Virginio Cantarelli & C. of S. Ilario D'Enza, Italy, on April 29, 1936, entered at $44 per 100 kilos, less cash discount of 2 per centum.

No. 120840–A. Pecorino Romano Sardo cheese from Ciro Piro of Naples, Italy, March 30, 1936, entered at $60 per 100 kilos less 2 per centum cash discount and less inland freight and cartage.

No. 123765–A. Provoloni cheese "A" brand and Provolette cheese "A" brand imported from Ditta Cav. Gennaro Auricchio of Naples, Italy, on April 28, 1936, entered at $42 per 100 kilos, less inland freight and cartage, and Provoloni cheese "G. A." brand and Provolettine cheese "G. A." brand entered at $40 per 100 kilos, less inland freight and cartage.

No. 120018–A. Pecorino Romano Genuino cheese from Soc. Esp. Polenghi Lombardo of Lodi, Italy, invoice certified on April 2, 1936, entered at $73 per 100 kilos, less 2 per centum cash discount and less inland freight.

The merchandise was appraised on the basis of export value at the unit entered values, packed, less 2 per centum discount and less non-dutiable charges, plus 20 per centum of the invoiced unit of value.

At the trial it was agreed between counsel that the basis of value on the invoice, entry, and appraisal is export value and that there is no foreign value for the merchandise.

Counsel for the plaintiff introduced the testimony of eight witnesses, namely, Mr. John Ambriola, the importer of the cheese covered by reappraisement 120021–A; Mr. Filippo Zichello, the importer of the cheese covered by reappraisement 120030–A; Mr. Louis Weisberg, who is connected with the firm of Moosalina Products Corporation, the importer of the cheese covered by reappraisement 120018–A; Mr. Arturo Bianco, the president of the firm of A. Bianco & Son, Inc., the inporter of the cheese covered by reappraisements 120840–A and 123765–A and an agent in the United States for certain exporters in Italy; Mr. Anthony J. Bendin, president of the firm of Bortolo Bendin, Inc., an importer of cheese; Mr. Herman E. Bossart who is an officer in Otto Roth & Co., an importer of cheese; Mr. Emanuel Feder who is connected with the firm of Leo Feder & Sons, an importer of cheese; and Mr. Dominick M. Ricardino, who is an officer in the firm of Ossola Bros., Inc., an importer of cheese.

The testimony of these witnesses was uniform and consistent. The first four witnesses above named, who represent importers of the merchandise herein involved, testified that they ordered the cheese either from the exporters in Italy or from the American representative of the Italian exporters at the invoice values and that they paid the prices shown on the invoices and did not pay any amount in addition thereto or give anything of value in addition. They stated that they had offers and could have purchased all the cheese they required at the prices shown on the invoices. They produced their private invoices, their contracts under which they purchased the cheese, the drafts showing the payments therefor, and also invoices, contracts, and drafts attached showing other sales of the same kind of cheese at about the same time as the shipments in this case and at substantially the same values as the unit entered values in this case.

The four other witnesses, who were not connected with the importers · of the merchandise in these cases, testified that they had received offers and made purchases of the same kinds of cheese at approximately the same prices as the unit entered values of the merchandise, and they produced invoices covering those sales together with contracts they entered into with drafts attached showing that they paid the prices shown on the invoices. They testified further that they paid no more than the amounts shown on the drafts, the invoices, and the contracts, and did not give anything of value in addition.

All of the witnesses testified that they had purchased such cheese in United States currency for several years and they made payment for the cheese to banks in the United States on which the drafts were drawn, all payments having been made in United States dollars. The witnesses all testified that they did not know of any value of such cheese higher than their invoice and contract values. The contracts, private invoices, drafts, etc., produced by the various witnesses were admitted in evidence and marked Collective Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, and 22.

The defendant introduced in evidence ten documents which appear to be copies of correspondence between the Commissioner of Customs and United States Treasury attachés or Treasury agents in Europe. They were received in evidence and marked Exhibits 23, 24, 25, 26, 27, 28, 29, 30, 31, and 32.

These exhibits have been carefully examined. Counsel for defendant, in introducing the exhibits, stated that a large part of the matter in the reports was not pertinent in this case. In explaining the part of the exhibits which he claims supports the appraisement, he stated:

My understanding of it is—at this moment, anyhow—that between July, 1935, up to and including October, 1936, there existed a law in Italy, and regulations under that law, which provided, in effect, that an importer in Italy could only import merchandise as against an equal amount of exportations from Italy.

That was brought about because at that particular time the balance of trade between Italy and the United States was about three to one in favor of the United States, and in order to try to equalize the trade they put these rules and regulations into effect.

Now, it resulted in something like this: The exporter would first have to export his goods before an importer was allowed to import any goods of equal value. For example, if an exporter was to export, let us say, a hundred dollars worth of cheese and an importer wanted to import some machinery from the United States into Italy, he would have to get together with the exporter and they would enter into an agreement which would allow the importer to import as against that export of $100.

Now, it got so that importers were trying to get exporters to enter into those agreements. All of these agreements, of course, had to be placed on file in certain offices of the Government. It was all under governmental control, that is, insofar as these compensation agreements, as they were called. * * * So it got so there was quite a demand for these privileges; so that the importer in order to gain an advantage, perhaps, over his competitor would go to an exporter an

.say, "Now, if you let me have it I will give you, say 5 per cent or 10 per cent." I think the reports show it ranged between 5 and 35 per cent. He would say, "I will give you 20 per cent in addition to what you receive for your cheese if you will grant to me, or assign or give me that privilege of importing against your export."

Now, the reports attempt to show that in these cases now before the court the exporters of this cheese, during the period of exportation, received, at lowest, an average of at least a 20 per cent bonus or premium, or whatever they want to call it, in addition to the price they received from these importers, and it was as a result of that that the appraiser here added 20 per cent to the value.

Exhibits 29, 30, 31, and 32 are the only ones which relate to investigations at the shippers of the merchandise herein involved. Exhibit 29 is a copy of a report by Treasury Attaché Bernard Wait, dated August 31, 1936, in which it is stated that a representative of his office visited G. Ambriola, the shipper of the cheese covered by reappraisement 120021–A and a brother of the importer of the merchandise in that case. The report states that Mr. G. Ambriola is not a regular dealer in cheese but that he purchased the cheese from Ciro Piro at $63 per quintal, c. i. f. New York (the price shown on the invoice covered by reappraisement 120021–A); that he acted as buying agent for his brother and expected to receive a commission of 1 per centum; that a 90 day draft for $1,836.70 had been drawn on the importer (the total value of the invoice is $1,836.74). The following, which is the basis of the Government's defense of the appraiser's advance, appears in the report:

Relative to the compensatory premium, it was stated that this was to be collected by Ciro Piro at time of payment in the approximate amount of 30%. Mr. Ambriola could not state the precise amount, since the relative records were in the hands of Ciro Piro.

Exhibit 30 is a report of Treasury Representative J. Homer Butler, dated August 18, 1936, relating to an investigation made at the place of business of Cantarelli Co., which company appears to be the shipper of the cheese covered by reappraisement 120030–A, but the investigation does not relate to the shipment covered by that appeal. Two shipments of cheese to the United States are reported, one on March 6, 1936, at $0.38 per kilo and the other on May 16, 1936, at $0.42 per kilo. (The shipment covered by reappraisement 120030–A, which was exported on April 29, 1936, was entered at $44 per hundred kilos, less 2 per centum discount.) The report states further that the same kind of cheese—Reggiano—is sold in Italy at lower prices. With respect to the point raised by defendant in support of the appraiser's advance, the report states:

COMPENSATION: On the shipments for the United States there has usually been from 20% to 30% compensation, approximately 75% of which they have habitually given to the client in reduced prices.

Exhibit 31 is a report by J. Homer Butler, dated August 21, 1936, relating to an investigation at the place of business of Cav. Gennaro Auricchio, the shipper of the cheese covered by reappraisement 123765–A. The report states that the basic price is $40 per hundred kilos for brand "A" of loaves from four to five kilos and $38 for brand "GA." (The cheese in reappraisement appeal 123765–A was entered at $42 per hundred kilos for brand "A" and $40 for brand "GA.") With respect to the subject of compensatory premiums, which the defendant claims sustains the appraiser's advance, the report states:

COMPENSATORY PREMIUM: On consular invoices it is stated that "no profit was made from sale of exchange". This statement is in error, since in actual practice the dollar invoice amounts were sold with compensatory premiums ranging from 20% to 40%.

Mr. Auricchio called attention to the fact that in some instances it is difficult to find the buyer of the currency within the time fixed by the currency regulations in force; other times the compensation obtained is lower than 20% or there are extra commissions to be paid. Everything considered, Mr. Auricchio stated, the net premium does not exceed 20%.

At time of taking out the consular invoice the final outcome with regard to premium is unknown, which explains the imprecise declaration on consular invoice that no profit has been made by reason of the sale of exchange.

Exhibit 32 is a report of Treasury Representative J. Homer Butler, dated August 21, 1936. The report states that the Treasury representative called upon Polenghi & Lombardo, which firm is the shipper of the cheese covered by reappraisement 120018–A which covers Pecorino Romano Genuino cheese exported on invoice certified April 2, 1936. The report states that "Bank advices concerning documents agreed with consular invoices". The report quotes no sales of Pecorino Romano Genuino cheese but refers to sales of Reggiano, Provoloni, and other kinds of cheese in May and June, 1936. With respect to the point which the defendant claims sustains the appraiser's advance, the report states:

COMPENSATION. Mr. Bedoni absolutely disclaimed all knowledge of compensation at first. When I insisted, saying that it was more usual not to receive it than to receive it, he said that he had been away for some time and was not familiar with the giving of it. The bank advices were then requested, and on each one there was notification of compensation, the name of the company with whom the arrangement had been made being given but no indication of the percentage. Mr. Bedoni finally claimed that when they did receive compensation it was a maximum of 10%. Since the transactions under consideration had not been terminated, there was no way of checking the amounts recorded.

There is nothing in these reports which indicates that the cheese was not freely offered for sale in Italy for export to the United States at the time of shipment of the merchandise in these cases at the prices at which the goods were entered. In fact, the reports seem to indicate that the merchandise was freely offered for sale and was sold at

the invoice or entered prices. Some of the statements in the reports respecting compensation premiums claimed to have been received by the manufacturers appear to be based on theory rather than actual facts which have evidentiary value. For instance, the statement in Exhibit 29 that the shipper G. Ambriola told the investigator that the manufacturer of the cheese—Ciro Piro—would collect approximately 30 per centum as compensation in addition to the invoice value of the cheese is purely hearsay. While the statute makes the customs agents' reports admissible in evidence, any statement in such report which is of itself based on hearsay, as the statement in that exhibit, has no evidentiary value in court.

In rebuttal the plaintiff introduced seven affidavits. Six of them were included in Collective Exhibit 33 and the other was marked Exhibit 34. The affidavit in Exhibit 34 is in the Italian language with a translation in English attached and the plaintiff called one witness—Mr. Louis J. Scaramelli—who testified to the correctness of the translation.

These affidavits are uniform in the statement that the principal market for Genuino Pecorino Romano cheese in Italy is in the district of Rome and the principal market for Sardo Pecorino Romano cheese is Macomber in the island of Sardegna; that the usual wholesale quantity in which such cheese was sold between the first of March, 1936, to the fourth of October was in lots of fifty cases, although one affiant said twenty-five; that they sold the cheese for export to the United States during that period at values in United States currency, the affidavits in Exhibit 33 all having invoices attached; that the prices on the invoices were the prices at which the cheese was actually sold and paid for; that the amount of dollars set forth on each invoice was collected through banks or other financial institutions and sold by them for their or the affiant's account at the best rate of exchange obtainable; and that the sale of said dollars did not influence the selling price of the merchandise described on the invoices. As an example of this latter statement, the following is quoted from the affidavit having the firm name of Castelli & Co. at the top:

Deponent further states that the amount of dollars set forth on each invoice was collected by his company through banks (or other financial institutions) and sold by them for its or our account at the best rate of exchange obtainable by American exporters in payment of merchandise bought and shipped from the United States to Italy and deponent further states that the sale of said dollars did not influence the selling price of the merchandise described on said invoices.

An examination of the invoices attached to the affidavits shows that the prices thereon for the same kind of cheese are in practical accord with the values on the invoices in the instant case where the dates of shipment substantially agree.

At the trial counsel for the plaintiff strenuously objected to the receipt of the documents offered by the defendant (Exhibits 23 to 32), but, after consideration, the exhibits were received in evidence with exception granted to the plaintiff. In his brief filed with the court, counsel for the plaintiff draws attention to certain defects in the exhibits which have a bearing on the weight which should be given them as evidence. The copies of letters in Exhibit 23 are criticized because they are dated April 27, 1935, and earlier, which dates are substantially a year prior to the importations herein. Those letters relate to the value of rayon rather than cheese.

As to Exhibit 24, which is a letter from the Commissioner of Customs, dated October 16, 1935, addressed to the Treasury attaché in Paris, France, giving instructions to the attaché, counsel for the plaintiff claims that the letter is of no value as evidence because it is dated 6 months prior to the importations and does not relate to the value of cheese which is the subject of these suits. However, the plaintiff draws attention to the fact that it is stated in the exhibit that the appraiser reports that premiums referred to in the inquiry would not be added to the invoice price of merchandise if the invoice value is the price at which such or similar merchandise is freely offered for sale for export to the United States in the usual wholesale quantities, in the ordinary course of trade on the date of exportation. The quotation from the appraiser's report in the letter reads as follows:

"that in the absence of a foreign value the merchandise would be appraised at the freely offered export price to the United States (even if the shipper receives extra compensation by sales of certificates), such freely offered price under the circumstances being construed to be the highest price obtaining on the date of exportation for the usual wholesale quantities in the ordinary course of trade".

Exhibit 25 is criticized by plaintiff because it contains copies in the Italian language of laws or decrees of the Italian Government with no translations thereof and that the statements of the customs agent construing those laws are mere conclusions drawn by the customs agent from his interpretation of those laws and that the laws are not proved in a legal manner.

Exhibit 26 is criticized by plaintiff on the ground that it is not a report of a customs agent giving facts discovered on an investigation. It is a copy of a letter to the Treasury attaché in Paris, France, signed by the Acting Commissioner of Customs, relating the facts that had been reported to him and requesting further information.

The defendant contends that the appraiser's advance in value in these cases was justified because the exporter received more money in the different transactions than the invoice values by securing additional funds by a compensation agreement concerning the United State dollars which the importers used in payment for the goods; that this situation was brought about by the laws of Italy requiring

that the value of importations into Italy should balance the exportations from that country; that previously the balance in trade between Italy and the United States was three to one in favor of the United States and after the decree became law there was such a demand for American goods in Italy that the Italian importers bid or negotiated for the United States dollars received by the Italian exporters of merchandise to the United States so that they could take advantage of the sums paid by the Americans and thereby import merchandise of equal value from the United States. To obtain the United States dollars and thus secure the privilege to import goods from the United States, the Italian importers were willing to pay and did pay more in lira for the dollars than the legal rate of exchange; and that the Italian exporters of cheese to the United States made an additional profit by the sale of the United States dollars they received. The defendant claims that this profit should be added to the value of the cheese covered by the importations herein involved.

While the record does not show that the shippers of the goods in this case made any profit from the sale of the United States dollars received for the merchandise, it is my opinion that if all the facts recited by the defendant were established such evidence would not show that the export value of the cheese in this case is higher than the entered value. In the first place, the statute does not provide that duty shall be assessed on the amount received by the foreign exporter for goods he ships to the United States. If such were the case there would be no application for the provisions of section 487 of the Tariff Act of 1930 permitting an importer, in making his entry, to deduct "from the cost or value given in the invoice as, in his opinion may * * * lower the same to the value of such merchandise."

Section 402 (d) of the Tariff Act of 1930 provides that "the export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported * * * for exportation to the United States." All of the witnesses in this case testified that cheese of the kinds involved on or about the dates of exportation were freely offered for sale for exportation to the United States at prices substantially the same as the entered values in this case. The law makes offers the criterion in determining value. Congress did not consider any sums which a foreign exporter received for his goods as having any bearing on the lawful entered value of imported merchandise.

Counsel for the plaintiff cites the case of *United States* v. *Fisher Scientific Co.*, 26 C. C. P. A. 278, C. A. D. 27. In that case the question for decision was whether a deduction of 20 per centum on the

invoice for "scrip benefit" was lawful. The court recites the facts as follows:

> The facts out of which the controversy grew may be stated broadly as follows: Under some German law, decree, or arrangement, the text of which does not appear in the record, German manufacturers of this type of merchandise may, under conditions of which we are not advised, purchase what is referred to in the record as "scrip" to the extent of 25 per centum of the list prices quoted in their catalogs, and upon their sales for export if they make deductions from such list prices they receive compensation for such deductions from the German Government. In the test case the importer received from the exporter a discount of 20 per centum from the prices listed in the catalog, and entry was made at a value which represented the catalog prices less such 20 per centum discount. The local appraiser at Pittsburgh advanced the values to the catalog prices without discount of the 20 per centum item. Importer thereupon appealed for reappraisement.

The trial judge held (*Fisher Scientific Co.* v. *United States*, 72 Treas. Dec. 1022, Reap. Dec. 4083) that export value was the proper basis for appraisement and that, as all importers in the United States received the 20 per centum deduction, the proper dutiable value was the entered value, saying:

> Then from uncontradicted evidence, what was the price at which such or similar merchandise was freely offered for sale to all purchasers in the principal markets of Germany in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States at the time of the exportation of the instant merchandise? Not the price the manufacturer *actually* received, for he received a 25 per centum scrip benefit or bounty from his Government in each sale of such or similar merchandise for export to the United States and then gave each purchaser of such or similar goods a credit of 20 per centum of said scrip benefit or bounty. So, the price paid by all purchasers of such or similar goods for export to the United States was not the price actually received by the manufacturer, but said price received by him, less 20 per centum discount. There is no question in my mind but that this 25 per centum discount received by the manufacturer from its Government is a bounty or grant. If so, there can be no question but that it is the duty of the collector of customs at the port of Pittsburgh under direction of the Secretary of the Treasury, pursuant to section 303 of the Tariff Act of 1930, to levy and collect an additional duty upon the instant merchandise equal to the net amount of said bounty or grant. But this bounty or grant should not be added by the appraiser to the *value* of said merchandise for it is not a part of the export dutiable value.

On appeal to Division Three (*United States* v. *Fisher Scientific Co.*, 73 Treas. Dec. 1375, Reap. Dec. 4219) the decision below was affirmed but the appellate division found that there was evidence in the record showing that there was a foreign value, but that the foreign value was the same as the export value. That decision was affirmed by the appellate court.

The only difference between the facts of the case cited and the facts claimed by the defendant to prevail in this case is that here it is not claimed that the government of Italy paid a bounty to the exporters of the merchandise. Here it is claimed that the foreign exporter

obtained more than the invoiced value by securing a profit on the sale of the United States currency received for the cheese, although the record does not show that the exporters actually did receive this profit. It shows merely that either they or the banks which held the funds for them may have received a profit by an exchange of the currency or a so-called compensation agreement.

The issue in this case was settled in *United States* v. *Fisher Scientific Co., supra,* and the merchandise must be appraised at the values at which it was freely offered for sale. I find that the weight of evidence sustains the the following facts:

1. Cheese of the character of that·here under appraisement was freely offered for sale in the principal markets of the country of exportation in the usual wholesale quantities and in the ordinary course of trade at the time of the exportation of the merchandise herein, for export to the United States, at the prices at which the goods in this case were entered and such values are the export values.

2. The principal markets of Italy in which such merchandise was freely sold were the districts of Rome and Macomber, in the island of Sardegna, and the usual wholesale quantities in which sales were consummated were in lots of fifty cases.

3. There was no foreign value for the goods.

On these findings of fact I hold that the merchandise must be appraised on the export values thereof and that such values are the entered values. Judgment will be entered accordingly.