UNITED STATES v. JACKSONVILLE PAPER CO.

No. 7579.—Invoices dated Helsingfors, Finland, August 16, 1938, etc.
Certified August 16, 1938, etc.
Entered at Jacksonville, Fla., September 28, 1938, etc.
Entry No. J–90, etc.

Third Division, Appellate Term

(Decided April 23, 1948)

*Paul P. Rao*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the appellant.
*Ragland, Kurz & Layton* (*Louis Kurz* of counsel) for the appellee.

Before CLINE, EKWALL, and LAWRENCE, Judges

CLINE, Judge: These are applications by the collector for review of a decision of the trial court sustaining the claim of the importer that

the invoiced values, less certain charges, represented the dutiable export value of the merchandise. *Jacksonville Paper Co.* v. *United States*, 18 Cust. Ct. 362, Reap. Dec. 6832. Appellant claims that the appraised values, based on foreign value, are the correct dutiable values.

The merchandise herein, described in the invoices as "M. G. Sulphate Wrapping Paper," was exported from Finland between August 16, 1938, and July 20, 1939. It was entered under duress at values higher than the invoice prices.

At the trial plaintiff introduced into evidence an affidavit of Ludvid Lundquist, managing director of the Swedish Paper Mills' Association (plaintiff's exhibit 1). This affidavit contains the following statements:

Affiant further says that the domestic price in Sweden is controlled by a committee composed of representatives of the paper makers' association and of the associations of wholesalers and users; that such committee fixes not only the price to be charged by the manufacturers for kraft and other paper, but as well the price to be charged therefor by the wholesalers, and also restricts the use to be made of the various types of paper by consumers; that any violation of the price lists or regulations, either or both so promulgated by such committee, may result in the exclusion of the violator from the association and make it impossible for him to obtain paper thereafter, because practically no paper is sold in Sweden except through these trade associations which control the price, sale, resale and use of paper through the joint committee aforesaid; and that such restrictions have been in force during 1936 and subsequent years.

\*        \*        \*        \*        \*        \*        \*

Affiant finally says that, in accordance with information received from and confirmed by the Finnish Paper Mills' Association, the same conditions as now outlined with regard to Sweden also applied to Finland during 1936 and subsequent years with the exception that the domestic price in Finland was and is not controlled by a committee as in the case of Sweden but fixed solely by the Finnish Paper Bureau, through which all sales of paper from the Finnish paper mills to the Finnish home market are effected.

Plaintiff also introduced into evidence an affidavit of Konrad Schuster (plaintiff's exhibit 4), which stated that he had been connected with the manufacture and sale of kraft paper in Finland for 25 years and was familiar with the prices, usages, customs, and regulations under which kraft paper was manufactured and sold for home consumption in the Finnish markets and for export. The affidavit continues:

Affiant further says that the domestic price of Kraft paper in Finland during the year 1936 and subsequent years, including the year 1939, and since that time is fixed and controlled by the Finnish Paper Bureau; that said Bureau fixes the price of all sales of Kraft paper from the Finnish Paper Mills to wholesalers. That the price of all manufacturers of Kraft paper in Finland is controlled and fixed by the Finnish Paper Bureau; that under said control consuming factories and industries cannot re-sell Kraft paper in the raw state; that any violation of the price

lists or regulations or restrictions so prescribed by the Finnish Paper Bureau makes it impossible for the violator to obtain paper thereafter because all Kraft paper sold in Finland is sold through the Finnish Paper Bureau.

C. G. McGehee, president of the Jacksonville Paper Co., testified that the purchase price of the imported merchandise was the market price obtained upon inquiries from various brokers; that the paper came in what is known as converter or Jumbo rolls, 29 inches in diameter, and was used to make sacks and paper bags; that none of it was used for wrapping paper.

James H. Madden, vice president in charge of kraft paper sales of Jay Madden Corporation, testified that his firm represented the Finnish Paper Mills Association; that he had been in the paper business since July 25, 1938; that he was in Finland from June until September 1939, but that he was not interested in the price of kraft paper in the Finnish home market but in the price established for export; that the prices paid by the Jacksonville Paper Co. from August 1938 to July 1939 were the prices at which he was selling paper of this same kind to all purchasers. A memorandum of the sales and prices received from the Jacksonville Paper Co. was received in evidence and marked "Plaintiff's Exhibit 5." Mr. Madden stated that the sales were made without any restrictions as to resale price or use; that the price was the same regardless of quantity; that the base price was for brown and gray machine-glazed kraft paper; that there was an up-charge for other colors. There was also admitted into evidence a memorandum of sales to other customers than the Jacksonville Paper Co. (plaintiff's exhibit 6).

On cross-examination, Mr. Madden's attention was called to certain items in the invoice in reappraisement No. 133690–A, and he stated that the item invoiced at $3.50 was for sheets and not Jumbo rolls, but he did not remember what the up-charge was for sheets. He also testified:

X Q. Will you look at that invoice for an item listed at $3.65 a hundred pounds and tell me whether that is in sheets?—A. That is for bleached machine glazed sulphate paper.

X Q. Aren't those sales listed on your list that you offered in Exhibit 5?—A. No, that is not. All I have listed here are for Jumbo rolls and machine glazed Kraft paper. This is machine glazed bleached sulphate. It is a different type. * * *

Appellant assigns as error that the trial court in effect held that the record contained proof that kraft paper and sulfate wrapping paper were similar. There is no direct testimony in the record on that point. Mr. Madden's statement, above quoted, indicates that there is a difference between machine-glazed kraft paper and machine-glazed bleached sulfate paper but does not make clear whether the distinction is between kraft paper and sulfate paper or between ordinary kraft paper and bleached paper. The merchandise herein is

described in the invoices as sulfate wrapping paper, but Mr. Madden, in referring to it in his testimony, called it kraft paper. Plaintiff's exhibit 5, which lists sales made to the Jacksonville Paper Co., including some of those involved herein, refers to it as kraft paper, as does plaintiff's exhibit 6, listing sales to other purchasers. No objection was made to Mr. Madden's testimony or to the admission of these exhibits on the ground that they were irrelevant. Both counsel and the court apparently assumed at the trial that kraft paper and sulfate paper were the same. Defendant's claim that there was no proof of similarity first appears in its brief below. We find, therefore, that the trial court did not err in continuing to assume that kraft paper and sulfate paper were similar and in disregarding an issue first raised in defendant's brief. See *United States* v. *Okuda & Co.*, 23 C. C. P. A. 46, T. D. 47713.

Appellant claims that the information in regard to the Finnish market contained in the affidavit of Ludvid Lundquist (plaintiff's exhibit 1) was hearsay and that the affidavit should not have been given any evidentiary value. When this affidavit was offered in evidence, counsel for the Government stated that the Government did not object, but reserved its right to object to the relevancy and competency of it. Although hearsay evidence, admitted without objection, may be considered by the court (*New England Fish Co.* v. *United States*, 15 Ct. Cust. Appls. 34, T. D. 42137; *United States* v. *Toledo Museum of Art*, 25 C. C. P. A. 373, T. D. 49455; *Agruba Trading Co.* v. *United States*, 14 Cust. Ct. 338, Reap. Dec. 6104), here there was an objection to the competency of the evidence and the defect therein could not have been cured except by the production of another affidavit by a qualified witness. See *Noonan* v. *Caledonia Mining Co.*, 121 U. S. 393. The objection, therefore, appears to be sufficient.

Moreover, at the time that *United States* v. *P. C. Kuyper & Co., Inc.*, 17 C. C. P. A. 139, T. D. 43471, was decided, a rule of this court (Rule 26), adopted in accordance with section 501 of the Tariff Act of 1922, provided:

At the hearing of appeals to reappraisement affidavits and reports of special agents abroad and other United States officials discharging their duties in investigating market conditions shall be considered and accorded such credence and probative value as, in the opinion of the justice, the circumstances may justify, *even though such reports may contain statements in the nature of hearsay or secondary evidence.* [Italics ours.]

The court stated, nevertheless, that "such evidence being in *ex parte* form should be carefully scrutinized and analyzed in determining what weight shall be given it." In *Ernesto Solari* v. *United States*, 5 Cust. Ct. 449, Reap. Dec. 4943, certain special agents' reports con-

tained statements based on theory rather than actual facts. The court stated:

> * * * While the statute makes the customs agents' reports admissible in evidence, any statement in such report which is of itself based on hearsay, as the statement in that exhibit, has no evidentiary value in court.

We find, therefore, that the statements in the affidavit of Ludvid Lundquist in regard to the Finnish market, being hearsay, have little, if any, evidentiary value.

The only other evidence as to the Finnish home market is supplied by the affidavit of Konrad Schuster (plaintiff's exhibit 4). According to his statement, the domestic price of paper to wholesalers is fixed and controlled by the Finnish Paper Bureau, the price asked by all manufacturers of kraft paper is controlled and fixed by said bureau, and consuming factories and industries cannot resell kraft paper in the raw state. However, it is not stated that the price charged by wholesalers is controlled and fixed by the bureau nor that the resale by others than consuming factories and industries is in any way restricted.

While it has been held that the fixing of prices by an association of dealers without any restrictions upon the purchasers as to resale or use does not create a controlled market (*United States* v. *Michele Diagonale*, 22 C. C. P. A. 517, T. D. 47497), in the instant case, there is some evidence of a restriction upon use at least as to consuming factories and industries. Whether or not there were any other purchasers is not indicated.

In *J. H. Cottman & Co.* v. *United States*, 20 C. C. P. A. 344, T. D. 46114, sales of phosphate were restricted to farmers for their own use and not for sale or export, to the factory where it was to be used in making superphosphate and not sold or exported, and to foreign countries. It was held that no foreign value could be found since the sales in the home market were for a limited and restricted use.

In *United States* v. *Half Moon Mfg. & Trading Co., Inc.*, 28 C. C. P. A. 1, C. A. D. 115, there was an agreement among the manufacturers of bottle caps in Holland fixing the prices at which inland sales could be made, providing that those to whom sales were made for use in Holland might not export the caps except after they had been attached to bottles, and further providing that dealers might not sell below specified prices. There the Government argued that the users were not engaged in the business of buying and selling bottle caps for profit and that the restriction imposed, so far as the users were concerned, was ineffectual and would not create a controlled market. The court held, however, that no foreign value could be found because of the restrictions on price and use.

In *United States* v. *Heemsoth-Kerner Corp.*, 31 C. C. P. A. 75, C. A. D. 252, which involved United States value, the importer sold directly or through agents to consumers or users at a fixed price, or to certain specified distributors for resale to consumers or users in their respective territories at fixed net prices. The court said:

So, while it appears that the merchandise is freely offered by appellee for sale in the principal market at list prices to all purchasers in some portions of the United States, it is not freely offered for sale by appellee at such list prices in such principal market to purchasers in territories allotted to distributors, which territories cover a major portion of the United States. Therefore, it may not be held that it is freely offered for sale in the principal market to all purchasers in the ordinary course of the trade within the meaning of section 402 (e), *supra*.

See also *United States* v. *Graham & Zenger, Inc.*, 31 C. C. P. A. 131, C. A. D. 262.

From these cases it may be deduced that a restriction upon the use of a product indicates a controlled market, even if such restriction does not involve all classes of customers. In the instant case the merchandise is not freely offered to all purchasers in the ordinary course of trade, since consuming factories and industries may not resell in the raw state. While the evidence of the precise restrictions imposed is meager, we think it is sufficient to establish *prima facie* that the foreign market was controlled, thus eliminating it as a basis for appraisement.

The evidence as to export value furnished by the testimony of Mr. Madden and plaintiff's exhibits 5 and 6 is uncontradicted, and is sufficient to establish the dutiable value of the merchandise.

From a consideration of the record before us, we find:

1. That there was no foreign value, as such value is defined in section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, for the instant merchandise at the time of exportation thereof.

2. That the proper basis for appraisement for said merchandise is export value, as such value is defined in section 402 (d) of said act.

3. That such dutiable export values of the merchandise covered by these reappraisement appeals are the invoice values, less consular fee, forwarding and loading charges, inland and ocean freight, and insurance.

The judgment below is therefore affirmed, and judgment will be rendered accordingly.