(Reap. Dec. 9033)

The Heyman Co., Inc. *v.* United States

Entry No. 904780.

(Decided December 11, 1957)

*Sharretts, Paley & Carter* (*Howard Clare Carter* of counsel for the plaintiff).
*George Cochran Doub*, Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the defendant.

Rao, Judge:   An importation from Mexico of so-called sisal pads was entered at the port of New York, at the invoice price of $0.09072 per pound, less nondutiable charges for inland freight, handling at the port of exportation, consular invoice, and ocean freight, as invoiced. The entry was appraised on the basis of export value, as that value is defined in section 402 (d) of the Tariff Act of 1930, at $0.10 per pound, less said charges for inland freight, handling, and consular invoice, and less ocean freight at $14, plus 2.2 per centum per 1,000 kilos, net packed on gross weight.

The Tariff Act of 1930 defines foreign and export values as follows: Section 402 (c), as amended by the Customs Administrative Act of 1938:

FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402 (d):

EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

In this appeal for reappraisement, it is claimed that neither the entered nor the appraised value is the proper value of the merchandise in question, and that the pads should have been appraised at $0.075 per pound f. o. b. Mexico City.

At the trial, counsel for the respective parties hereto agreed to certain facts, which I find as follows:

1. That the merchandise in issue consists of pads, composed wholly of henequen fiber, about one-quarter of an inch in thickness and weighing approximately 3 ounces per square foot, manufactured by Progress Padding Co., S. A., of Merida, Yucatan, Mexico (hereinafter called Progress).

2. That appraisement was made on the basis of statutory export value, as defined in section 402 (d), *supra*, of similar pads of 100 per centum henequen fiber, manufactured or produced by Cordeleria Santa Ines, S. A., of Merida, Yucatan, Mexico (hereinafter called Santa Ines).

3. That there is no statutory foreign or export value for "such" merchandise, manufactured or produced by Progress.

4. That Santa Ines manufactures or produces pads of 100 per centum henequen fiber which are similar to the instant merchandise.

5. That if a statutory foreign value exists for said similar merchandise it is no higher than the appraised value.

6. That the principal market of Mexico for the sale of pads of 100 per centum henequen fiber for home consumption or for exportation to the United States is Merida, Yucatan, Mexico.

7. That the usual wholesale quantity for the sale of 100 per centum henequen pads, for sale in the ordinary course of trade, in said principal market, for exportation to the United States, is a carload lot of from 20,000 to 24,000 pounds.

8. That Fibras Duras de Mexico, S. A., of Mexico City, D. F., Mexico (hereinafter called Duras), manufactures or produces pads of 100 per centum ixtle (istle) fiber, which merchandise was freely offered for sale for home consumption in Mexico and for exportation to the United States, at all times pertinent hereto, in the principal market of Mexico City, D. F., Mexico; and

9. That the usual wholesale quantity thereof for sales for domestic consumption or for exportation to the United States is a carload lot of from 20,000 to 24,000 pounds.

In addition, the parties agreed that, if the court should find that no foreign or export value existed for such or similar merchandise, the submission of this case be set aside, and the matter be restored to the calendar for evidence of United States value and cost of production.

The remainder of the evidence is documentary, and consists, on behalf of plaintiff, of affidavits of Halim R. Gaber, manager of Progress (plaintiff's collective exhibit 1), of Pedro Montalvo Burgos, submanager of Santa Ines, (plaintiff's collective exhibit 2), and of Antonio Garcia, managing director of Duras (plaintiff's collective exhibit 3 and plaintiff's exhibit 4).

Each of said affiants was interviewed by Joe M. Uberuaga, a United States Treasury representative, and reports of said interviews were introduced into evidence by defendant, as defendant's collective exhibits A, B, and C. Accompanying each report is an affidavit of the respective individual questioned by said Treasury representative.

The affidavit of Gaber, and the report relating thereto, in the main, substantiate the stipulated facts. These exhibits show that Progress makes no sales for home consumption in Mexico and that its sales for exportation to the United States are restricted to its exclusive agent, the Heyman Co., ultimate consignee herein, which takes the entire production of these pads from Progress.

Although the pads are called sisal pads, they are, in fact, manufactured from henequen by processes in which the fiber is "first opened or fluffed, then garnetted or carded and finally loomed. Barbed needles are driven through the loose batt causing some of the fiber to be driven through the batt holding it tightly matted." The pads are used in the upholstery and bedding industries.

It further appears from said exhibits that sisal pads, manufactured by Santa Ines, are similar in every respect to those produced by Progress and, in the opinion of Gaber, are commercially interchangeable therewith.

Gaber also stated that Duras produces a pad of istle, manufactured in the same manner as the instant merchandise and used for the same purposes in the bedding and upholstery industries. The cost of manufacture of istle pads is practically the same as that of henequen pads, but some difference exists in the cost of the fibers.

A portion of plaintiff's collective exhibit 1 and part of defendant's collective exhibit A are devoted to cost of production figures. In view of the stipulation of the parties, this evidence is not presently relevant.

Plaintiff's collective exhibit 2 and defendant's collective exhibit B relate to the business practices of Santa Ines. In the affidavit which was signed for plaintiff, on February 24, 1956, Pedro Montalvo Burgos, submanager of the firm, stated:

During the years 1954 and 1955, my company sold its pads for export to the United States only to a limited number of purchasers. We did not freely offer the pads to all purchasers for export to the United States because the policy of the Company is to limit its sales to only one dealer in any given area of the United States.

The prices to such purchasers were quoted only on a C. I. F. basis, with an allowance of $14.00 per metric ton, plus 2.2% for freight, on shipments to Gulf Coast ports, and an allowance of $22.00 per metric ton, plus 2.2% for freight, on shipments to Atlantic Coast ports. Allowance is also made for freight from Merida to the seaport for handling charges and for consular invoice fees. There was no single price to all purchasers.

When interviewed by the Treasury representative in July 1956, Montalvo denied that his company restricted its sales to certain American importers or that there was any relationship other than buyer and seller between Santa Ines and its American customers. On the contrary, he stated that sales were not restricted to any purchaser or class of purchaser, and that, although since December 1, 1954, his firm had only two customers in the United States, namely, Hemley Supply Co. of Brooklyn, N. Y., and Henley Paper Co. of High Point, N. C., "he is willing to sell to all purchasers, who would meet his prices."

Annexed to defendant's collective exhibit B is a list of all sales made by Santa Ines for exportation to the United States from November 29, 1954, to July 16, 1956. An examination of those sales of grade-A quality merchandise made between April 19, 1955, and September 17, 1955, the 6-month period including the date of exportation of the merchandise at bar which occurred on May 17, 1955, reveals 11 sales to the Hemley Supply Co. at $0.10 per pound, c. i. f., New York, and 2 sales to the Henley Paper Co., one at $0.10 per pound c. i. f. Philadelphia, the other at $0.10 per pound c. i. f. New Orleans.

Plaintiff's collective exhibit 3, plaintiff's exhibit 4, and defendant's collective exhibit C relate to the business and sales practices of Duras. They show that the pads manufactured by that company are composed

of ixtle de palma fiber, 50 per centum long and 50 per centum short fiber, which are known in the United States as sisal pads and are used in the bedding and upholstering industries. In plaintiff's collective exhibit 3, it was stated that they are used for the same purposes as the sisal pads manufactured by Progress and Santa Ines. In the affidavit annexed to defendant's collective exhibit C, the same affiant averred that the products of Progress and those of Duras are "similar in process of manufacturing and might in some cases be interchangeably used, but they are not manufactured from the same raw material." The pads manufactured by Duras are freely offered for sale to all purchasers for home consumption and for exportation to the United States, in Mexico City, in carload lots. The price for home consumption at all times relevant hereto was $1.65 Mexican pesos per kilogram; for exportation to the United States, the price was 7½ cents per pound, f. o. b., Mexico City.

On the basis of this record, plaintiff contends that there is no foreign or export value, as those values are defined by statute, *supra*, for such or similar merchandise produced from 100 per centum henequen fiber, and that the evidence being sufficient to establish that sisal pads, composed of ixtle (istle) fiber are similar to the imported product, the proper value therefor is $0.075 per pound, net packed, f. o. b. Mexico City, Mexico.

Counsel for defendant seeks to sustain the appraised value on the theory that the admittedly similar pads produced by Santa Ines were freely offered for sale to all purchasers for exportation to the United States at such values. It is alternatively urged, in the event that sales by Santa Ines do not establish an export value within the dictates of the statute, that the pads produced by Duras are not similar for the reason that they are composed of different material.

In effect, the record before me is one in which each of the witnesses for the plaintiff is also a witness for the defendant, and that witness whose merchandise was selected as the basis of the appraised value has given contradictory testimony upon a material fact. For the plaintiff, he has stated that his company's sales to the United States were restricted to only one dealer in any given area of the United States and that there was no single price to all purchasers. For defendant, he has denied that the company's sales are restricted to any purchaser or class of purchaser, and has insisted that he is willing to sell to all who would meet his prices.

None of the surrounding facts or circumstances set forth in either of his affidavits or in the Treasury agent's report prompts the selection of either of these conflicting statements as representative of the true situation which obtains with respect to the export sales practices of Santa Ines. It is not to be supposed, as advocated by defendant, that the interview and the second affidavit, being later in time and

made with knowledge of the contents of the first, necessarily expresses the truth.

I am disposed to the view that the evidence with respect to the question of whether or not Santa Ines freely offered its merchandise to all purchasers for exportation to the United States without restrictions is so directly conflicting as to nullify itself, and that, therefore, there is a failure of proof with respect to this fact.

However, there are other considerations which impel the rejection of the appraised value as one which conforms to the statutory definition of export value. Export value is defined as the market value or price at which such or similar merchandise is freely offered for sale to all purchasers, and it has been held that the statute does not contemplate the existence of more than one market value or price for such or similar merchandise at the same time. *United States* v. *Minkus*, 21 C. C. P. A. (Customs) 382, T. D. 46912.

As heretofore observed, the Treasury representative's report lists 11 sales from Santa Ines to the Hemley Supply Co. for the period between April 19, 1955, and September 17, 1955, at a price of $0.10 per pound, c. i. f. New York, and 2 sales to the Henley Paper Co., one at $0.10 per pound c. i. f. New Orleans, the other at $0.10 per pound c. i. f. Philadelphia.

In his initial affidavit, Montalvo stated that prices "were quoted only on a C. I. F. basis, with an allowance of $14.00 per metric ton, plus 2.2% for freight, on shipments to Gulf Coast ports, and an allowance of $22.00 per metric ton, plus 2.2% for freight, on shipments to Atlantic Coast ports. Allowance is also made for freight from Merida to the seaport for handling charges and for consular invoice fees." That United States gulf coast ports are nearer to Mexican seaports than United States Atlantic coast ports, and that, ordinarily, ocean freight costs increase as the distances traversed increase are matters which may be judicially noticed. It is reasonably inferable therefrom that ocean freight charges from the port of exportation to Atlantic coast ports are greater than those to gulf coast ports. Accordingly, I am inclined to accept as credible evidence the allowances for ocean freight, as set forth in plaintiff's collective exhibit 2. Since the price at which Santa Ines sold to its American customers was a c. i. f. price, which, nevertheless, did not change during the pertinent period, despite the ocean freight differentials, it follows that there was no one freely offered price in the principal market of the country of exportation at or about the time of exportation. Assuming the other nondutiable charges to be constant, the deduction of varying freight rates from the price of $0.10 per pound results in different net prices. There was, therefore, no single uniform price for all purchasers, and no export value can be predicated on sales made by

Santa Ines. *United States* v. *Kellogg Co.*, 19 Cust. Ct. 330, Reap. Dec. 7456.

The appraiser having adopted such sales as the basis of his appraisement, the presumption of correctness attaching to his action has been destroyed.

Turning now to the question of whether the pads manufactured by Duras are similar merchandise within the contemplation of the export value provision of the Tariff Act of 1930, *supra*, I am of opinion that plaintiff has sustained its burden of proof in that respect. In the oft-quoted case of *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T. D. 42837, it was said:

* * * The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other. It is in this sense, we believe, that the word similar was used in said section 402 (b).

Similarity of use has been regarded as a compelling factor in determining what constitutes similar merchandise. *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714; *United States* v. *Kraft Phenix Cheese Corp. et al.*, 26 C. C. P. A. (Customs) 224, C. A. D. 21. The Government does not dispute similarity of construction and use but points to a difference in component material and cost thereof as evidence of dissimilarity. That the variation in cost is not so great as to negative commercial interchangeability seems clear here. A comparison of the net prices of the three typical pads adverted to in this case shows a differential of less than $0.02 per pound.

There is substantial evidence which establishes that pads of ixtle (istle) fiber, like pads of henequen fiber, are known in the United States as sisal pads and are used for the same purposes in the bedding and upholstery industries. I, therefore, find that so-called sisal pads composed of ixtle (istle) fiber are similar to the imported merchandise for purposes of appraisement.

Since Duras freely offered its merchandise for sale to all purchasers for exportation to the United States at a price which conforms in all respects with the statutory definition of export value, and the foreign value thereof was not higher, I find that price to be the proper value of the merchandise at bar.

Accordingly, I make the following findings of fact:

1. The merchandise involved in this case consists of sisal pads of 100 per centum henequen fiber, about one-quarter of an inch in thick-

ness and weighing approximately 3 ounces per square foot, manufactured by Progress Padding Co., S. A., of Merida, Yucatan, Mexico.

2. At or about the date of exportation of the merchandise at bar, Progress did not offer its merchandise for sale for home consumption in Mexico.

3. All sales by Progress for exportation to the United States were restricted to an exclusive agent.

4. Similar pads of 100 per centum henequen fiber are manufactured by Cordeleria Santa Ines, S. A., of Merida, Yucatan, Mexico.

5. At or about the date of exportation herein, Santa Ines did not offer its pads for sale for home consumption in Mexico.

6. At or about the date of exportation herein, the price at which Santa Ines sold its merchandise for exportation to the United States was not the same for all purchasers.

7. The appraised value of $0.10 per pound, less nondutiable charges, less ocean freight at $14, plus 2.2 per centum per 1,000 kilos, net packed on gross weight, was predicated upon sales made by said Santa Ines.

8. Similar pads composed of 100 per centum ixtle de palma (istle) fiber are manufactured by Fibras Duras de Mexico, S. A., of Mexico City, D. F., Mexico.

9. At all times pertinent hereto, Duras freely offered and sold its merchandise for exportation to the United States at $0.075 per pound, net packed, f. o. b. Mexico City, in the usual wholesale quantities and in the ordinary course of trade, and its sales for home consumption in Mexico were not higher.

10. The principal market in Mexico for the sale of 100 per centum henequen pads is Merida, Yucatan, Mexico, and for the sale of 100 per centum ixtle de palma (istle) fiber pads is Mexico City, D. F., Mexico.

11. The usual wholesale quantity involved in the sale of such or similar merchandise is a carload lot of from 20,000 to 24,000 pounds.

Upon these findings, I conclude that—

1. There is no statutory foreign or export value for such or similar sisal pads composed of 100 per centum henequen fiber.

2. The proper basis for the appraisement of the instant merchandise is the export value of similar sisal pads composed of 100 per centum ixtle de palma (istle) fiber.

3. The statutory export value of similar sisal pads composed of 100 per centum ixtle de palma (istle) fiber is $0.075 per pound net packed, f. o. b. Mexico City.

4. There is no higher foreign value for such or similar merchandise.

Judgment will be entered accordingly.