(Reap. Dec. 10157)

THE HEYMAN CO., INC. *v.* UNITED STATES

Entry Nos. 726378; 745184; 752531.

(Decided February 1, 1962)

*Sharretts, Paley & Carter* (*Howard Clare Carter* of counsel) for the plaintiff.
*William H. Orrick, Jr.*, Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the defendant.

RAO, Judge: The three appeals for reappraisement herein involved have been consolidated for purposes of trial. They relate to several importations of so-called sisal pads, which are, in fact, composed wholly of henequen fiber. The pads in issue were manufactured by Progress Padding Co., S.A., of Merida, Yucatan, Mexico (hereinafter called Progress), and were exported to the United States during August and September 1955. They were appraised on the basis of the statutory export value of similar merchandise (§ 402(d), Tariff Act of 1930)[1] produced by Cordeleria Santa Ines, S.A., of Merida,

---

[1] [SEC. 402],(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

Yucatan, Mexico (hereinafter called Santa Ines), at $0.10 per pound, less charges for inland freight, handling at the port of exportation, consular invoice fee, and less ocean freight at United States $14, plus 2.2 per centum per 1,000 kilos, net, packed, on gross weight.

It is the contention of the plaintiff that there was no statutory export or foreign value (§ 402(c), Tariff Act of 1930, as amended) for such merchandise, or for the concededly similar merchandise produced by Santa Ines, and that the merchandise should have been appraised on the basis of the export value of similar pads, composed of 100 per centum ixtle de palma (istle) fiber, produced by Fibras Duras de Mexico, S.A., of Mexico City, D.F., Mexico (hereinafter called Duras) at $0.075 per pound, net, packed, f.o.b., Mexico City.

The issues posed in the instant case are substantially the same as those raised in the case of *United States* v. *The Heyman Co., Inc.*, 48 C.C.P.A. (Customs) 13, C.A.D. 755, and the record thereof has been incorporated into the instant case.

There, as here, the merchandise consisted of sisal pads manufactured by Progress and appraised on the basis of the export value of similar pads of 100 per centum henequen fiber manufactured and produced by Santa Ines, and the date of exportation of the shipment involved preceded those at bar by a few months.

The record in the incorporated case consisted of a stipulation of the parties, to the effect that there was no statutory export or foreign value for such merchandise, manufactured or produced by Progress; that the sisal pads, manufactured by Santa Ines, were similar merchandise; and that Duras manufactured pads of 100 per centum ixtle (istle) fiber, which were freely offered for sale for home consumption in Mexico and for exportation to the United States, in the principal market of Mexico City, D.F., Mexico. It was also stipulated that Merida, Yucatan, Mexico, was the principal market of Mexico for the sale of pads of 100 per centum henequen fiber and that the usual wholesale quantities for the sale of both henequen and ixtle (istle) fiber pads were a carload lot of from 20,000 to 24,000 pounds.

As the case developed, the dispute between the parties centered about certain evidence relating to the sales practices of Santa Ines, as set forth in an affidavit of its submanager, Pedro Montalvo Burgos, introduced into evidence as plaintiff's exhibit 2, and in a second affidavit, executed by said Montalvo and embodied in a report of an interview with him conducted by Joe M. Uberuaga, a United States Treasury representative (defendant's collective exhibit B). The other material issue in the decided case was the question of the similarity, for purposes of appraisement, between the pads manufactured by Progress and those produced by Duras.

In his initial affidavit, executed on February 24, 1956, plaintiff's exhibit 2 in the incorporated case, Montalvo stated, in part:

During the years 1954 and 1955, my company sold its pads for export to the United States only to a limited number of purchasers. We did not freely offer the pads to all purchasers for export to the United States because the policy of the Company is to limit its sales to only one dealer in any given area of the United States.

The prices to such purchasers were quoted only on a C.I.F. basis, with an allowance of $14.00 per metric ton, plus 2.2% for freight, on shipments to Gulf Coast ports, and an allowance of $22.00 per metric ton, plus 2.2% for freight, on shipments to Atlantic Coast ports. Allowance is also made for freight from Merida to the seaport for handling charges and for consular invoice fees. There was no single price to all purchasers.

The interview with the Treasury agent was conducted on July 25 and 27, 1956. The Treasury agent reported the following, concerning the question of whether or not Santa Ines restricted its sales for exportation to the United States:

In this respect, Mr. Montalvo emphatically stated that his firm does not restrict its sales to certain American importers. He advised that he is willing to sell to all purchasers, who would meet his prices. He further stated that the relationship existing between the manufacturer and the importers involved [Hemley Supply Co., Brooklyn, N.Y., and Henley Paper Co., High Point, N.C., the only two customers in the United States his firm had since December 1, 1954] is that of seller and buyers, respectively. The merchandise was sold outright and the manufacturer has no further interest in the merchandise after the sale. Mr. Montalvo informed me that no contracts or oral agreements exist between his firm and the importers, nor do his firm and the importers have any financial interest in each other. He also informed me that the sale of merchandise is not restricted to any purchaser or class of purchaser.

The accompanying affidavit apparently supports the Treasury agent's summation. It states in part:

* * * We do not have any exclusive agents or distributors either in the home market or in the United States. We sell directly to the importers, CIF Gulf of Mexico ports or Atlantic ports (Philadelphia and New York) ; that our selling prices for the home market are the same as to the United States; that at the present time we are only selling to two United States firms, but we could sell to other firms if our prices were accepted; * * *.

The writer of this opinion, sitting as the single trial judge in the incorporated case, *The Heyman Co., Inc.* v. *United States*, 39 Cust. Ct. 707, Reap. Dec. 9033, rehearing denied, 40 Cust. Ct. 687, Reap. Dec. 9067, found the foregoing statements of the affiant to be so directly conflicting as to be self-nullifying, and, accordingly, held that there was a failure of proof of the material fact of whether Santa Ines freely offered its merchandise for sale to all purchasers. However, from other evidence in the record, to wit, the list of sales for the period between April 19, 1955, and September 17, 1955, showing a constant price of $0.10 per pound c.i.f. Gulf or Atlantic coast ports, this court held that there was "no single uniform price for all purchasers, and no export value can be predicated on sales made by

Santa Ines. *United States* v. *Kellogg Co.*, 19 Cust. Ct. 330, Reap. Dec. 7456."

The reasoning behind my conclusion to that effect lay in the fact that a c.i.f. price is not the price contemplated by the statutory definition of export value and that the deduction of the nondutiable element of ocean freight, which was not the same for Gulf and Atlantic coast ports, left a net price which was not uniform for all purchasers and, hence, not acceptable for the purpose of determining export value, for "the statute does not contemplate the existence of more than one market value or price for such or similar merchandise at the same time. *United States* v. *Minkus*, 21 C.C.P.A. (Customs) 382, T.D. 46912."

It was further held that the ixtle (istle) fiber pads manufactured by Duras were similar pads to those manufactured by Progress, especially since they were devoted to the same ultimate uses in the bedding and upholstery industries, and, inasmuch as the Duras product was shown to have been freely offered for sale for exportation to the United States, to all purchasers in the usual wholesale quantities and in the ordinary course of trade, at $0.075 per pound, net, packed, f.o.b. Mexico City, that price was accepted as the statutory export value of the sisal pads involved in the incorporated case.

Upon appeal to the third division of this court (*United States* v. *The Heyman Co., Inc.*, 43 Cust. Ct. 619, A.R.D. 113), the conclusion that Santa Ines' prices were not uniform was sustained, for the reasons heretofore expressed (Donlon, J., dissenting in that respect). However, the court did not find the two affidavits of Montalvo to be inconsistent or contradictory. It considered the original affidavit to be descriptive of the restrictive sales policy of the company obtaining during the years 1954 and 1955, but not necessarily reflecting conditions under which the company might be willing to make sales in 1956 or thereafter, as indicated by the later statement. The court further held that the pads manufactured by Duras were similar merchandise, by reason of similarity in methods of manufacture and ultimate use, and commercial interchangeability. The erroneous ruling concerning the evidentiary value of the statements of Montalvo was held not to be reversible error, and, accordingly, the decision and judgment of the trial court were affirmed.

The Court of Customs and Patent Appeals, in C.A.D. 755, *supra*, agreed that the several statements of Montalvo were not conflicting. Commenting upon this phase of the case, it stated:

In his affidavit of February 24, 1956, Montalvo clearly and unequivocally stated that his company, during 1954 and 1955, did not freely offer the merchandise in question for sale to all purchasers, but to a limited number only. That statement is not contradicted by any statement in the later affidavit or interview. The later statements relate only to the policy of the company at the time

when they were made, namely, July of 1956. That the company at that time "could sell to other firms if our prices were accepted" affords no valid evidence that similar policy was pursued in 1955. On the contrary, Montalvo stated that as of July 1956 sales were being made to only two United States firms, which would seem to confirm his earlier statement as to a limited sales policy during the preceding years.

In our opinion the evidence amply supports the holding of the Customs Court that Santa Ines was not, during 1955, freely offering merchandise similar to that at bar for sale to all purchasers within the meaning of Section 402(d). It is accordingly unnecessary to consider the further holding of the majority of the Customs Court that said merchandise was not offered at a single price.

The court further held that there was a sufficient resemblance between the pads manufactured by Duras and those produced by Progress to support the holding of similarity, and that it was immaterial that the principal market for the sale of the former was not the same as the principal market for the sale of the latter. "Section 402(d) appears to place no limitation on the location of principal markets so long as they are in the country of export."

A third affidavit of Montalvo, executed March 18, 1958 (plaintiff's exhibit 1), constitutes plaintiff's only new evidence in the present case. It purports to clarify and further to reconcile his earlier statements, showing that circumstances had changed between them. In it, the affiant recites that his company entered into an agreement with the General Importing Co. of Los Angeles early in 1952, which conferred upon that company an option to purchase the entire output of Santa Ines. It was the understanding of the parties that all unpurchased merchandise could be sold to others in the United States by Santa Ines, provided permission was first obtained from General Importing Co. The agreement was actually in effect until March 1, 1956, but General Import took no merchandise after 1953. All sales made in 1954 and 1955 to other American customers were separately authorized by General Importing Co.

Montalvo further averred that, after the beginning of 1954, all prices were determined by negotiation with each prospective customer, and, as a consequence, could be, and often were, different for any one type, quality, and grade. All sales were made on a c.i.f. basis, and ocean freight rates to Gulf ports were $14 per metric ton, plus 2.2 per centum, and to Atlantic ports, $22 per metric ton, plus 2.2 per centum.

With respect to sales for domestic consumption in Mexico, Montalvo stated that prices were arrived at by negotiation with individual customers, depending on the orders on hand, market conditions, and the bargaining ability of the purchaser.

Defendant introduced a report of Treasury Representative J. Eug. Cauchon, dated March 10, 1954, of an investigation of Santa Ines, made February 22, 1954 (defendant's exhibit A). In that

report, the Treasury agent sets forth the information he obtained from Tomás Martín de leon, general manager, and his two sons, Tomás Martín Vásquez, office manager, and Alfonso Martín Vásquez, plant manager. He quotes the father as saying that "no written contracts or oral agreements existed between his firm and the importers, and that the sale of such merchandise was not restricted to any purchaser or class of purchasers"; "that such merchandise was, and is, freely offered to all purchasers for exportation to the United States, without restriction as to resale or use"; and that there was an office pricelist, which served as a basis "from which actual selling prices are arranged with individual purchasers, according to orders placed and market conditions."

The report lists all sales for exportation to the United States from July 1953 to February 19, 1954, of which six were of the grade-A quality here involved. Such sales were as follows:

| Consular invoice number | Date certified | Date order accepted | CIF selling price | Port | Purchaser |
|---|---|---|---|---|---|
| 86 | 7/23/53 | 7/1/53 | 0. 1175 | New Orleans | W. L. Richeson & Sons |
| 87 | 7/23/53 | 7/1/53 | 0. 1150 | New Orleans | Ware Cotton Batting Co. |
| 867 | 1/14/54 | 12/24/53 | 0. 105 | Philadelphia | J. C. McCloy, Jr. |
| 868 | 1/14/54 | 12/31/53 | 0. 10 | New York | Gerald A. Kearney |
| 869 | 1/14/54 | 1/5/54 | 0. 10 | New York | General Twine Corp. |
| 1005 | 2/19/54 | 2/5/54 | 0. 105 | New York | Hemley Supply Co., Inc. |

No sales of grade-A quality are shown for domestic consumption.

In an affidavit, introduced as defendant's exhibit B, Geo. F. Ingold, secretary of Henley Paper Co. of High Point, N.C., stated that his firm made two purchases of grade-A pads of 100 per centum henequen fiber, exported on May 10, 1955, and May 17, 1955, and that the price therefor was $0.10 per pound, c.i.f., New Orleans or Philadelphia; that such merchandise was freely offered at that price without bargaining; and that there were no restrictions on the purchases.

Similar testimony was given in court by Arnold Hemley, president of the Hemley Supply Co. of Brooklyn, N.Y. This company received 11 shipments of grade-A, 100 per centum henequen fiber sisal pads from Santa Ines between April 19, 1955, and September 17, 1955, for which it paid $0.10 per pound, c.i.f., New York. It had no agreement with Santa Ines with respect to the purchase or resale of the merchandise, and the price paid was the price asked. The witness was unaware of any exclusive contract Santa Ines may have had with General Importing Co.

Counsel for the plaintiff contend that there is no additional evidence in the present record to warrant a departure from the conclusions reached in the decided case. It is urged that the statements in defend-

ant's exhibit A, which apparently contradict plaintiff's exhibit 1, are to be rejected as hearsay evidence insufficient to overcome the "positive sworn testimony" of the affiant.

It is, of course, settled law that hearsay evidence contained in a memorandum or report has little, if any, probative value. *Socony-Vacuum Oil Co., Inc.* v. *United States*, 37 Cust. Ct. 129, C.D. 1811; *United States* v. *Jacksonville Paper Co.*, 20 Cust. Ct. 425, Reap. Dec. 7579; *G. R. Kirk Co., F. W. Myers & Co.* v. *United States*, 7 Cust. Ct. 424, Reap. Dec. 5387. And much of defendant's exhibit A consists of what is clearly hearsay, being no more than the Treasury agent's version of what was said to him by the persons he interviewed. Yet, he did therein certify "that the data contained in this report was obtained by personal inspection of the regular books of account and other records of the said firm except as otherwise stated herein."

It is reasonably inferable that if the company, in February 1954, was operating under an exclusive agreement of the kind described in plaintiff's exhibit 1, some evidence thereof must have been brought to his attention. That it apparently was not; that plaintiff's exhibit 1 fails to state whether the agreement was written or oral; that if the former, no copy thereof is provided; that there is no evidence of the specific "consents" of General Importing Co. for any of the sales made in 1953 and early 1954, or, indeed, while the alleged contract remained in effect; that, whereas plaintiff's exhibit 2, in the decided case, describes the sales policy of 1954 and 1955 as restricted to a limited number of purchasers and limited "to only one dealer in any given area of the United States," it contains no reference to the alleged agreement with General Importing Co.; and that the new affidavit purports to rely on said agreement, rather than on the limited number of purchasers as establishing a restrictive sales policy, are factors which not only tend to undermine the probative force of plaintiff's exhibit 1, but as well cast doubt on the sufficiency of the first affidavit to establish whether or not Santa Ines was freely offering its merchandise to all purchasers in 1955.

It is significant also that neither of the two firms which purchased sisal pads from Santa Ines in 1954 and 1955 was aware of any policy on the part of that company either to limit the total number of purchasers or to restrict the number of purchasers in any given area of the United States. The record, in this respect, is now so confused as to incline this court once more to reject the evidence on this phase of the case.

However, there is no new evidence in the instant record to disturb the finding that Santa Ines' prices were not uniform. As is established by the testimony of the affiant Ingold, sisal pads were shipped to his firm on May 10, 1955, and May 17, 1955, at a price of $0.10 per pound, c.i.f., Philadelphia and c.i.f., New Orleans, respectively;

and the record reveals sales to Hemley Supply Co. on May 14 and May 30, 1955, at $0.10 per pound, c.i.f., New York. From the very nature of these transactions, the price included ocean freight to the port of destination, which was $14 per metric ton, plus 2.2 per centum, for Gulf ports, and $22 per metric ton, plus 2.2 per centum for Atlantic coast ports.

In the case of *John A. Steer & Co.* v. *United States*, 30 Cust. Ct. 504, Reap. Dec. 8196, cited with approval in *United States* v. *Paul A. Straub & Co., Inc.*, 41 C.C.P.A. (Customs) 209, C.A.D. 553, this court stated:

* * * Included in said price were, of course, certain charges, such as for-warding and lading fees, consular fee, marine and war risk insurance, and ocean freight, which, because they ordinarily accrue subsequent to the time when the merchandise is in the principal market, in condition, packed ready for shipment to the United States, are not, and, since the act of 1890, have never been, considered as dutiable items. *The John Shillito Company* v. *United States*, 5 Treas. Dec. 555, T.D. 23851; *United States* v. *Samuel Shapiro & Co. et al.*, 65 Treas. Dec. 1650, Reap. Dec. 3268; *International Commercial Co., Inc., and Armour & Co.* v. *United States*, 26 Cust. Ct. 607, Reap. Dec. 7980, affirmed, 28 Cust. Ct. 629, Reap. Dec. 8112.

It seems clear that when the different charges for ocean freight are deducted from the uniform sales price to arrive at the net price in the principal market of the country of exportation, two different prices are obtained. And if there was no one price at which Santa Ines' merchandise was freely offered for sale to all purchasers for exportation to the United States, in the usual wholesale quantities and in the ordinary course of trade, there was no export value, within the meaning of section 402(d) of the Tariff Act of 1930. *United States* v. *North American Asbestos Corp.*, 48 C.C.P.A. (Customs) 153, C.A.D. 783.

Since the issue of similarity as between the imported product and the ixtle de palma (istle) fiber pads manufactured by Duras has not again been raised, and there being no new evidence to consider in this connection, the affirmative ruling of the decided case must apply. The Duras price is one which conforms with the statutory definition of export value and is, therefore, the proper value of the merchandise at bar.

Accordingly, I make the following findings of fact:

1. The merchandise involved in this case consists of sisal pads of 100 per centum henequen fiber, manufactured by Progress Padding Co., S.A., of Merida, Yucatan, Mexico.

2. At or about the date of exportation of the merchandise at bar, Progress did not offer its merchandise for sale for home consumption in Mexico.

3. All sales by Progress for exportation to the United States were restricted to an exclusive agent.

4. Similar pads of 100 per centum henequen fiber are manufactured by Cordeleria Santa Ines, S.A., of Merida, Yucatan, Mexico.

5. At or about the dates of exportation herein, Santa Ines did not offer its pads for home consumption in Mexico.

6. At or about the date of exportation herein, the price at which Santa Ines sold its merchandise for exportation to the United States was not the same for all purchasers.

7. The appraised value of $0.10 per pound, less nondutiable charges, less ocean freight at $14, plus 2.2 per centum per 1,000 kilos, net, packed, on gross weight, was predicated upon sales made by said Santa Ines.

8. Similar pads composed of 100 per centum ixtle de palma (istle) fiber are manufactured by Fibras Duras de Mexico, S.A., of Mexico City, D.F., Mexico.

9. At all times pertinent hereto, Duras freely offered and sold its merchandise for exportation to the United States at $0.075 per pound, net, packed, f.o.b. Mexico City, in the usual wholesale quantities and in the ordinary course of trade, and its sales for home consumption in Mexico were not higher.

10. The principal market in Mexico for the sale of 100 per centum henequen pads is Merida, Yucatan, Mexico, and for the sale of 100 per centum ixtle de palma (istle) fiber pads is Mexico City, D.F., Mexico.

11. The usual wholesale quantity involved in the sale of such or similar merchandise is a carload lot of from 20,000 to 24,000 pounds.

Upon these findings, I conclude that—

1. There is no statutory foreign or export value for such or similar sisal pads composed of 100 per centum henequen fiber.

2. The proper basis for the appraisement of the instant merchandise is the export value of similar sisal pads composed of 100 per centum ixtle de palma (istle) fiber.

3. The statutory export value of similar sisal pads composed of 100 per centum ixtle de palma (istle) fiber is $0.075 per pound, net, packed, f.o.b. Mexico City.

4. There is no higher foreign value for such or similar merchandise. Judgment will be entered accordingly.