(A.R.D. 157)

UNITED STATES *v.* THE HEYMAN CO., INC.

Entry Nos. 726378; 745184; 752531.

## Third Division, Appellate Term

(Decided June 10, 1963)

*John W. Douglas*, Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the appellant.

*Sharretts, Paley & Carter* (*Howard Clare Carter* and *Eugene F. Blauvelt* of counsel) for the appellee.

Before DONLON and RICHARDSON, Judges; DONLON, J., concurring

RICHARDSON, Judge: This is an application for review of the decision and judgment of a single judge sitting in reappraisement and holding that export value of similar merchandise is the proper dutiable value of the involved merchandise. From the judgment entered on February 1, 1962, and reported in 48 Cust. Ct. 533, Reap. Dec. 10157, the defendant appeals.

The involved merchandise consists of so-called sisal pads, composed of 100 per centum henequen fiber, about ¼ inch in thickness and weighing approximately 3 ounces per square foot. The merchandise was produced in Merida, Yucatan, Mexico, by the Progress Padding Co. and was entered at New York in August and September 1955 at the invoice price of $0.09072 per pound, c.i.f. New York. The pads were appraised on the basis of the export value of similar henequen fiber pads of grade "A" quality, produced by Cordeleria Santa Ines, S.A., of Merida, Mexico, at $0.10 per pound, less inland charges and less ocean freight of $14, plus 2.2 per centum per metric ton, gross weight. On reappraisement, the appellee contended and the single judge found the proper basis of valuation to be the export value of similar istle de palma fiber pads, produced by Fibras Duras de Mexico, S.A., of Mexico City, D.F., Mexico, at $0.075 per pound, net, packed, f.o.b.

Mexico City. It was claimed by the Government before a single judge and is now claimed by the Government before us that the appraised values represent the proper dutiable values of the subject merchandise. It is the position of the appellant that, at the time of exportation of the involved merchandise, similar merchandise produced by Santa Ines was *freely offered for sale* at Merida, Mexico, to all purchasers for exportation to the United States at a *single price* of $0.10 per pound, c.i.f. Gulf and Atlantic coast ports, in consequence of which no occasion was presented for the single judge to consider similar istle de palma fiber pads as a basis of valuation of the subject merchandise. It is not disputed by the parties, and is amply established in the record, that the statutory export value is the proper basis of valuation of the subject merchandise.[1] And it is further established in the record that, at the time in question, there was no export value for merchandise such as that here involved, in view of the fact that the manufacturer's entire output was consigned to the appellee.

The record which was before the single judge consists of an affidavit, dated March 18, 1958, executed by Pedro Montalvo Burgos, submanager of Cordeleria Santa Ines, S.A. (plaintiff's exhibit 1) ; a Treasury Department report, dated March 10, 1954 (defendant's exhibit A); an affidavit, dated June 13, 1961, executed by George F. Ingold, secretary of Henley Paper Co. of High Point, N.C. (defendant's exhibit B) ; a customs agent's report, dated June 8, 1961 (defendant's exhibit C) ; the testimony of defendant's witness Arnold Hemley, president of Hemley Supply Co. of Brooklyn, N.Y.; and the record in the case of *United States* v. *The Heyman Co., Inc.*, 48 CCPA 13, C.A.D. 755, which was incorporated herein as part of the record of this case.

The involved merchandise is the same as that before the courts in C.A.D. 755. In the decided case, the single judge held the proper basis of valuation of sisal pads, manufactured by Progress Padding Co., to be export value of similar istle de palma fiber pads, manufactured by Fibras Duras, and that such value was $0.075 per pound, net, packed, f.o.b. Mexico City. The court rejected certain evidence pertaining to the sales practices of Santa Ines, which it found to be contradictory, and found that the record was, consequently, barren of any evidence that the merchandise, manufactured by Santa Ines, was *freely offered for sale* in Mexico to all purchasers for exportation to the United States at a *single price*.

---

[1] 19 U.S.C.A., section 1402(d) (§ 402(d), Tariff Act of 1930) :

EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The evidence which the single judge rejected in the decided case consists of an initial affidavit, executed by the said Pedro Montalvo Burgos on February 24, 1956 (plaintiff's collective exhibit 2 in the decided case), and a Treasury Department report (defendant's collective exhibit B in the decided case), containing a second affidavit, executed by Santa Ines' said submanager on July 30, 1956. In his first affidavit, Santa Ines' submanager stated, among other things, *that his company sold its pads for exportation to the United States only to a limited number of purchasers and that there was no single price to all purchasers*. In the Treasury report, it is said that the submanager stated, on July 25 and 27, 1956, that his firm *does not* restrict its sales to certain American importers. And, in his second affidavit, which accompanied this report, the submanager stated that he *could* sell to United States firms (other than the only two customers his firm had in the United States from December 1954 to July 1956, Hemley Supply Co. of Brooklyn, N.Y., and Henley Paper Co. of High Point, N.C.), if they *would* meet his prices.

Upon the review of the single judge's decision in the prior case, we took the view that the aforesaid evidence was not contradictory, was reconciliable, and indicated that Santa Ines' merchandise was sold in a restricted market. A majority of this court also affirmed the single judge's finding, in that case, that Santa Ines' pads were not offered for sale in Mexico for exportation to the United States at a uniform price to all purchasers. And we affirmed the single judge's finding that the pads produced by Fibras Duras were similar merchandise, in consequence of which we upheld the trial court's determination of value in the decided case. Upon appeal by the Government to the court of appeals, our finding and conclusion in the prior case, with respect to the evidence and restrictive sales policy of Santa Ines, were upheld by that court, who also affirmed the determination of value made by the single judge and upheld by this court.

With respect to the additional evidence adduced in the case at bar, we observe the following facts: In plaintiff's exhibit 1, Santa Ines' submanager undertakes, in a third affidavit, executed before our decision was handed down in A.R.D. 113, to reconcile the claimed conflict in his statements in earlier affidavits obtained from him. He avers that both statements of fact set forth in his first and second affidavits are true. He stated, however, that, in the interim between the execution of the first and second affidavits, circumstances changed and that he reported the change of circumstances to the Treasury representative who interviewed him, and who omitted this fact from the Treasury report. He then restated the facts chronologically, to wit, that, between 1952 and March 1, 1956, Santa Ines had an agreement with General Importing Co. of Los Angeles, under which

agreement General Importing Co. was entitled to purchase Santa Ines' entire output of pads, with the right reserved to Santa Ines to sell with General's permission all pads not purchased by General; that General made purchases under this agreement during 1952 and 1953 and Santa Ines during 1954 and 1955 with General's permission; that Santa Ines terminated its relationship with General on or about March 1, 1956, changed its policy of reserving its entire output for one purchaser and decided to sell to anyone desirous of buying from it; that there was no change in Santa Ines' method of determining selling prices, which were arrived at after negotiation with each prospective purchaser; and that sales to United States purchasers were on a c.i.f. basis, with Santa Ines paying lower freight rates to Gulf coast ports than to Atlantic coast ports and receiving lower net prices per pound when the pads were shipped to Atlantic coast ports than when they were shipped to Gulf coast ports.

Defendant's exhibit A is a Treasury representative's report of an interview, held on February 22, 1954, with Santa Ines' general manager, Tomas Martin de Leon, and his two sons, Tomas Martin Vasquez, office manager, and Alfonso Martin Vasquez, plant manager. Under the heading "Export Value," the report states that the only relationship between the manufacturer and the importers is that of seller and buyers; that no agreements or contracts existed between them and that sales were not restricted to any purchaser or class of purchasers; that the pads were and are freely offered for sale to all purchasers for exportation to the United States, without restriction as to resale or use; and that the merchandise is sold directly to the purchasers, without the intervention of purchasing agents or commissionaires. Under the subheading "Prices," the report states:

The manufacturer does not publish a price list but keeps one for office use in arriving at his sales prices.

The prices shown thereon for the period June to September 1953 were as follow:

|  | "A" White | "B" Clear | "C" Obscure |
|---|---|---|---|
|  | $0.11 | $0.1025 | $0.095 |
| From Sept. 1953 to date | 0.1025 | 0.095 | 0.0875 |

These prices are in U.S. currency, per lb., C.I.F. all Gulf and Atlantic Seaboard ports. These are base prices, from which actual selling prices are arranged with individual purchasers, according to orders placed and market conditions. Actual selling prices from June 1953 to date of inquiry were as shown under "Sales" hereinafter.

The actual sales prices reported for this period reflect variations from these list prices for the three classes of merchandise sold for exportation to the United States.

Defendant's exhibit B and the testimony of defendant's witness, Arnold Hemley, are to the same effect, namely, that Santa Ines sold its grade "A" pads to Henley Paper Co. of High Point, N.C., and

Hemley Supply Co. of Brooklyn, N.Y., during 1955 at a uniform price of $0.10 per pound, c.i.f. New Orleans, Philadelphia, and New York, and they received no allowance from the exporter for ocean freight or otherwise.

Defendant's exhibit C is a report of the results of a customs investigation, initiated at the request of the Assistant Attorney General, in order to verify the existence of the purchase agreement referred to in plaintiff's exhibit 1. The report indicates that General Importing Co. went out of business following the death of the firm owner in April 1956 and that the whereabouts of the firm's records were not known and were believed to have been destroyed.

In dealing with this additional evidence, in the case at bar, the single judge again rejected the statements of Santa Ines' submanager. The court indicated that plaintiff's exhibit 1 confused the court, compounded the difficulty of determining the sales policy of Santa Ines during the period in question, and discredited both the first and third affidavits of the submanager on the question of whether Santa Ines' merchandise was freely offered for sale to all purchasers in 1955 for exportation to the United States. The single judge adhered to its original view with respect to the lack of a uniform price to all purchasers, noting that defendant's exhibit B and the testimony of Mr. Hemley proved the existence of price differentials between exportations destined to Gulf ports and those destined to Atlantic coast ports. And the trial judge also noted the absence of any issue of similarity as between the involved merchandise and istle de palma fiber pads, manufactured by Fibras Duras, and, in the absence of new evidence on the matter, the trial judge followed the holding of similarity in the decided case with respect to the two products.

We agree with the single judge that similarity is not an issue in the instant case and that the holding in the decided case is controlling here on the matter of similarity. The question before us, therefore, is whether the additional evidence introduced into the case at bar warrants a finding contrary to that reached by the single judge, which was that Santa Ines' merchandise was not freely offered for sale to all purchasers for exportation to the United States at a uniform price.

However, in this connection, we again must differ with the trial judge over the rejection of evidence on the matter of Santa Ines' sales practices emanating from its submanager, Pedro Montalvo Burgos. In our opinion, the additional evidence on this subject, which is contained in plaintiff's exhibit 1, should have been received by the trial judge and weighed in with the other evidence in the record on the matter, with a view toward ascertaining the creditable version in the case. We do not find plaintiff's exhibit 1 confusing or complex. Nor do we find any occasion for the belief, apparently

entertained by the trial court, that the affidavit, designated plaintiff's exhibit 1, represents an attempt by Santa Ines' submanager to supplant his initial affidavit on the matter of his firm's restrictive sales practices and adopt an altogether different cause for such restrictive practices. As we view the matter, there is a plausible cause and effect relationship between an exclusive purchase agreement of the kind detailed in plaintiff's exhibit 1, on the one hand, and a limited customer policy resulting from the operation of such an agreement, on the other hand. As we read the document, plaintiff's exhibit 1 introduces additional facts which tend to explain, rather than confound, the nature of the sales practices employed by Santa Ines during the period in question.

It will be observed that defendant's exhibit A repudiates plaintiff's exhibit 1 on the matter of the exclusive purchase agreement. The Treasury report, which is designated herein as defendant's exhibit A, was prepared from earlier interviews with other Santa Ines' personnel, conducted on February 22, 1954. Presumably, this report was available at the time of the trial of the decided case, but, for some reason, it was not used—very possibly because the report concerns itself with sisal pads, exported from Mexico by Santa Ines and imported by General Importing Co., matters with which the decided case was not then concerned.

In any event, with the introduction into the instant case of the relationship between Santa Ines and General Importing Co. by Santa Ines' submanager, the report becomes relevant and material. While the report does establish General Importing Co. as the largest importer of Santa Ines' grade "C" pads during mid-1953, with substantially smaller lots of Santa Ines' pads of grades "A" and "B" qualities being imported by other American firms during the same period, this report negates any suggestion that these transactions involving General were predicated upon any exclusive purchase agreement. Further, the report states that the only relationship existing between Santa Ines and the American importers was that of seller and buyers. Of course, such statement must be interpreted in the light of the fact, also discernible from the report, that no other large importations of Santa Ines' pads were made by other American importers until after the rejection by General in October 1953 of a large order of pads, which was subsequently purchased by another American importer. But, if we understand appellant's position in placing defendant's exhibit A in evidence, it is that the prominence of General Importing Co. in Santa Ines' volume of export trade to the United States is at best a fortuitous circumstance, having no relationship to any exclusive purchase agreement between the two.

In one significant aspect, however, defendant's exhibit A is in accord with averments of plaintiff's exhibit 1 and that is on the

matter of price arrangements. In both documents, it is stated, in substance, that export sales prices were arranged with customers on an individual basis.

In reappraisement proceedings where there is a conflict between statements contained in sworn affidavits and those contained in Treasury reports submitted to the court on particular issues, the statements in the affidavits are generally accorded greater weight, by reason of the sworn character of their recitals. *Allied Food Corp. of America* v. *United States*, 29 Cust. Ct. 438, Reap. Dec. 8135; *Reynolds Electrical & Engineering Co.* v. *United States*, 26 Cust. Ct. 638, Reap. Dec. 7983; *United States* v. *Canada Packers, Ltd.*, 8 Cust. Ct. 697, Reap. Dec. 5624. For the same reason, we give credence to plaintiff's exhibit 1 on the matter of the exclusive purchase agreement over conflicting statements contained in defendant's exhibit A, pertaining to such matter, although we note that the trial judge was inclined to reject defendant's exhibit A, on the ground that much of it was predicated on hearsay evidence. And, inasmuch as we find the additional evidence set forth in plaintiff's exhibit 1 to be consistent with the other evidence in the record relating to Santa Ines' sales practices on which we have previously ruled, we conclude that similar henequen fiber pads, manufactured by Santa Ines, were not, at the time in question, freely offered for sale in Mexico for exportation to the United States.

With respect to the other issue in the case, namely, whether there was a uniform price at which Santa Ines offered its pads for sale to all purchasers, additional evidence has been presented, in the case at bar, in the form of an affidavit and testimony to the effect that Santa Ines sold similar henequen fiber pads to two American buyers in 1955 at the same price of $0.10 per pound, c.i.f. Gulf and Atlantic coast ports. This, according to appellant, constitutes evidence of the existence of a single price sufficient to overcome the trial court's ruling to the contrary. The single judge was of the opinion, as was a majority of this court on a previous review of the decided case, that the ocean freight differentials to which Santa Ines' prices were subject, when quoted on a c.i.f. basis to various Gulf and Atlantic coast ports, resulted in different prices for pads shipped to those ports. Appellant now argues that "Whether or not that uniform unit price included ocean freight to destination is wholly immaterial to the issue of determining the export value," citing in support thereof the cases of *United States* v. *Zellerbach Paper Co. et al.*, 28 CCPA 303, C.A.D. 159; *United States* v. *Paul A. Straub & Co., Inc.*, 41 CCPA 209, C.A.D. 553; and *Albert Mattola et al.* v. *United States*, 46 CCPA 17, C.A.D. 689.

These cases proceed on the basis of statutory foreign and export valuations and involve considerations of f.o.b. prices and expenditures

for inland freight and other charges as elements of such values. In these cases, the courts ruled that inland freight differentials in the offered price delivered at different ports do not affect uniformity of the one price paid for the merchandise in the foreign country. We agree with the appellee that these cases are not applicable to the case at bar. Inland freight, under a f.o.b. foreign port contract, is an element of expense which accrues while the merchandise is in the foreign country of exportation and, as such, constitutes an appropriate element to be included in the valuation. However, the statutory basis of value before us, namely, export value, admonishes us to reject as an element of value those charges which accrue subsequent to the time the merchandise leaves foreign shores. Such is the nature of ocean freight which, unlike inland freight, accrues subsequent to the time the merchandise is exported from foreign shores and, as such, cannot properly constitute an element of such valuation. *United States* v. *New England Foil Corp.*, 10 Cust. Ct. 596, 597, Reap. Dec. 5856. See also, *United States* v. *F. C. Gerlach & Co. et al.*, 7 Cust. Ct. 494, 504, Reap. Dec. 5443.

The price quoted by Santa Ines for merchandise similar to the involved merchandise includes charges for the merchandise landed at New York [2] and not charges for the merchandise *in condition*, packed ready for shipment to the United States. In fact, it has not been shown that Santa Ines' pads could have been purchased in the home market for exportation to the United States at a price which did not include ocean freight. Consequently, there is no evidence of record of a *single home market price* as such for Santa Ines' merchandise on the basis of which a statutory export price can be determined.

Apart from the matter of ocean freight differentials as affecting the uniformity and stability of the price quoted by Santa Ines, we question the propriety of finding a single offering price for Santa Ines' merchandise on the basis of its sales to Henley Paper Co. and Hemley Supply Co. in 1955, in the face of uncontroverted evidence emanating from both parties to the litigation that Santa Ines' prices were arrived at by negotiation with individual customers. At best, such prices represent prices at which Santa Ines' pads were sold to these two customers, who apparently were the only two stateside customers that Santa Ines had during the time in question. Prices which they paid for the merchandise could not possibly establish Santa Ines' pricing policies. There is no reason to believe that more reliable evidence of Santa Ines' sales practices would emanate from Santa Ines' customers than from the manufacturer itself. Moreover, the fact that neither of these two customers were aware of any exclusive pur-

---

[2] It is nowhere explained in the record why appraisement of the involved merchandise should have included a computation for ocean freight to New York at a rate established by Santa Ines for delivery at a Gulf coast port.

chase agreement or other restrictive sales policies of Santa Ines is of no moment and certainly does not negate their existence. There has not been shown in the record the existence of any obligation of Santa Ines to reveal its policies and practices to these or any of its customers. And, in our opinion, it is not reasonably to be expected that such information would be volunteered by Santa Ines in the normal course of events.

Under all of the circumstances of the instant record, we are fully in accord with the conclusions reached by the judge herein, although we differ with the single judge with respect to some of the reasons assigned for those conclusions. Accordingly, we make the following findings of fact:

1. The merchandise involved herein consists of sisal pads, composed of 100 per centum henequen fibers, manufactured by Progress Padding Co., S.A., of Merida, Yucatan, Mexico.

2. At or about the dates of exportation of the involved merchandise, said manufacturer did not offer such merchandise for sale in Mexico for home consumption, and its sales for exportation to the United States were restricted to an exclusive agent.

3. Similar pads of 100 per centum henequen fibers are manufactured by Cordeleria Santa Ines, S.A., of Merida, Yucatan, Mexico.

4. At or about the dates of exportation of the involved merchandise, Santa Ines did not offer its pads for sale in Mexico for home consumption and did not there freely offer its merchandise for sale at a single price and to all purchasers for exportation to the United States.

5. Similar pads, composed of 100 per centum istle de palma fibers, are manufactured by Fibras Duras de Mexico, S.A., of Mexico City, D.F., Mexico.

6. At or about the dates of exportation of the involved merchandise, Fibras Duras freely offered its merchandise for sale in Mexico to all purchasers for exportation to the United States at $0.075 per pound, net, packed, f.o.b. Mexico City, in the usual wholesale quantities and in the ordinary course of trade, and its sales there for home consumption were not higher.

7. The principal market in Mexico for the sale of 100 per centum istle de palma fiber pads is Mexico City, D.F., Mexico.

8. The usual wholesale quantity involved in the sale of such or similar merchandise is a carload lot of from 20,000 to 24,000 pounds.

Upon these findings, we conclude that:

1. There is no statutory foreign or export value for such or similar sisal pads, composed of 100 per centum henequen fibers, and no higher foreign value for similar sisal pads, composed of 100 per centum istle de palma fibers.

2. The statutory export value of similar sisal pads, composed of 100 per centum istle de palma fibers, is the proper basis for the determination of the value of the involved merchandise, and such value is $0.075 per pound, net, packed, f.o.b. Mexico City.

The judgment of the trial court is affirmed, and judgment will be entered accordingly.

### CONCURRING OPINION

DONLON, Judge: For the reasons stated in my concurring opinion in *United States* v. *The Heyman Co., Inc.*, 43 Cust. Ct. 619, A.R.D. 113, in which the same parties litigated the same issue as that now before us, I concur in the result reached by Judge Richardson. I concur, also, that the newly adduced evidence is consistent with the evidence in the incorporated record, with respect to the restricted dealer policy of Cordeleria Santa Ines, in exporting similar merchandise to the United States.

However, I do not agree with the entire finding of fact number 4. I do not find that there was not a uniform price at which similar merchandise was offered to all buyers for exportation to the United States.

The cases which are cited involve other fact situations. The price of offerings, as an element of deciding what basis of appraisement is to be used, is not necessarily identical with the value of the merchandise.

Our appeals court declined to go into this issue, in *United States* v. *The Heyman Co., Inc.*, 48 CCPA 13, C.A.D. 755, saying:

In our opinion the evidence amply supports the holding of the Customs Court that Santa Ines was not, during 1955, freely offering merchandise similar to that at bar for sale to all purchasers within the meaning of Section 402(d). *It is accordingly unnecessary to consider the further holding of the majority of the Customs Court that said merchandise was not offered at a single price.* [Emphasis supplied.] [P. 16.]

I, too, find it unnecessary here to consider that issue, and for the same reason.